UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

RONALD SANTOS

    Plaintiff,

v.

ISIDRO BACA, et.al.,

    Defendants.

Case No. 2:11-CV-01251-KJD-NJK

**ORDER**

Presently before the Court are Defendants' Partial Motions for Summary Judgment (##269, 270, 271). Plaintiff did not file a response and the time to do so has passed.

**I. Background**

Plaintiff is an inmate currently housed at Ely State Prison (hereinafter referred to as "ESP"), however all allegations contained in Plaintiff's operative Complaint (#36) occurred while Plaintiff was housed at High Desert State Prison (hereinafter referred to as "HDSP").

HDSP is the largest major institution in the Nevada Department of Corrections. The complex totals approximately 1,576,000 square feet of space. The institution opened September 1, 2000 and became the reception center for Southern Nevada. HDSP is administered by a Warden and four Associate Wardens. Command Staff consists of ten Lieutenants and thirteen Sergeants. There are approximately 400 security staff and 67 support staff stationed at HDSP. HDSP's total inmate capacity is approximately 4,176, and during the time of the operative Complaint, HDSP housed over 3,500 inmates.

Plaintiff initially filed his Complaint on August 1, 2011 (#2) which contained five causes of action. The Court screened said Complaint and issued a screening order on February 13, 2012, which dismissed three of the five counts in their entirety, and allowed Plaintiff an opportunity to

amend. (#7). Plaintiff filed his First Amended Complaint on May 14, 2012, naming twenty-two defendants and streamlined his claims into three causes of action. (#11). A subsequent screening order (#15) was issued on February 25, 2013.

On July 23, 2013, Defendants filed a Motion for Partial Dismissal, requesting that the Court dismiss Defendant Dwight Neven on the theory of supervisor liability, which was denied. (##27, 35). On August 2, 2013, Plaintiff filed a Motion for Leave of Court to File a Second Amended Complaint (#30). Plaintiff did not include a copy of his proposed Second Amended Complaint in the motion, nevertheless, Plaintiff sought to amend his Complaint to include that all Defendants acted in their official capacity and to add a request for injunctive relief. (#30). On September 30, 2013, the Court granted Plaintiff's motion to amend only as to the injunctive relief, and for the purposes of adding facts regarding Defendant Neven's involvement in the alleged violations in Plaintiff's Complaint (#35).

Plaintiff then filed a Second Amended Complaint (#36). Defendants moved to strike the Complaint because Plaintiff included several changes that were not permitted within the four corners of the second screening order, including the addition of at least five previously unnamed parties, and the inclusion of additional allegations regarding parties other than Neven.

In ruling on the motion, this Court incorporated the Second Amended Complaint in question as a motion to file a Third Amended Complaint under Fed. R. Civ. Pro. 15(a)(2), denied Defendants' motion to strike, and ordered that the electronic filing be re-titled the "Third Amended Complaint," and ordered that document #36 shall be the operative Complaint. (#40). The Third Amended Complaint alleged three distinct causes of action, naming over 20 parties, requesting relief under different constitutional claims and different theories of liability for each Defendant.

On August 29, 2016, Defendants filed three Partial Motions for Summary Judgment (##269, 270, 271) with Declarations from all remaining represented Defendants. (##272-284). Plaintiff did not file any dispositive motions.

Rather than respond, Plaintiff filed a motion to strike on September 30, 2016, and motion for enlargement of time to respond to dispositive motions. (##298, 299). Defendants filed a non-opposition to the motion for enlargement in lieu of the size of the pleadings.

On February 28, 2017, the Court ordered that Santos' motion to strike Defendants' partial motions for summary judgment were denied, and that Plaintiff's motion to strike declarations was denied. (#306). Concurrently, the Court entered a new scheduling order requiring that a response to partial motions for summary judgment was due on March 17, 2017, reasoning that since the motions were originally filed on August 29, 2016, "Plaintiff has had ample time to respond to Defendants' motions" and advised that no further extensions would be granted. (#307).

Plaintiff filed a request for reconsideration and/or clarification on March 7, 2017 and requested an additional extension of 21 days to respond to pending motions. (#308). The Court denied the motion for reconsideration and found the motion "baseless and without merit." (#311). The Court granted leave to respond to each of the partial motions within Local Rule 7-3 limitations, but advised that no extensions or continuances would be granted. The time to respond remained at March 17, 2017. As of the date of this Order, Plaintiff has not filed a response.

**II. Legal Standard**

    **A. Title 42 U.S.C. § 1983 Standard**

Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." Conn v. Gabbert, 526 U.S. 286, 290 (1999). Section 1983 does not offer any substantive rights, but provides procedural protections for federal rights granted elsewhere. Albright v. Oliver, 510 U.S. 266, 271 (1994). To prove liability under Section 1983, a plaintiff must: (1) show that a person acting under color of state law engaged in some type of conduct, which (2) deprived the plaintiff of some right, privilege or immunity secured by the Constitution or federal statutory law. Parratt v. Taylor, 451 U.S. 527, 535 (1981), overturned on other grounds by Daniels v. Williams, 474 U.S. 327 (1986).

**B. Summary Judgment**

Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323.

The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(e). "[U]ncorroborated and self-serving testimony," without more, will not create a "genuine issue" of material fact precluding summary judgment. Villiarimo v. Aloha Island Air Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

**III. Analysis**

**A. Plaintiff's Count 1: First Amendment and RLUIPA**

HDSP enacted a policy requiring that a minimum of five (5) inmates request attendance at a faith group service in the HDSP chapel before they can use the chapel. According to Defendants, by developing this policy, HDSP took into account staffing availability, efficient use of limited resources, security of inmates, and staff safety.

Plaintiff, a practicing member of the Jewish religion, alleges that the HDSP chapel policy violates his First Amendment Free Exercise rights and Religious Land Use and Institutionalized Persons Act (hereinafter referred to as "RLUIPA") rights. Plaintiff also states that Judaism requires that he be able to light Shabbat candles one hour before sunset on Friday and Saturday, with the lighting to be followed by services those evenings. Plaintiff states that the only gathering he recalled

for Jewish inmates at HDSP was a Rosh Hashana celebration sometime around September, 2010.

**1. First Amendment Standard**

Convicted prisoners do not lose their First Amendment right to freely exercise their religion by virtue of their incarceration. Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972). However, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights...." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)). A prisoner's right to freely exercise his or her religion is necessarily limited by incarceration, and may be curtailed to achieve legitimate correctional goals or to maintain prison security. McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir.1987) (per curiam). To merit protection under the Free Exercise Clause, a prisoner's religious claim must satisfy two basic criteria. Callahan v. Woods, 658 F.2d 679, 683 (9th Cir.1981). First, the prisoner's proffered belief must be "sincerely held." Id. Second, the claim must be "rooted in religious belief"—not in "purely secular" philosophical concerns. Id; see Shakur v. Schriro, 514 F.3d 878, 885 (9th Cir.2008) (sincerity test set forth in Malik v. Brown, 16 F.3d 330, 333 (9th Cir.1994), and Callahan, 658 F.2d at 683, determines the applicability of the Free Exercise Clause).

Even if a prison regulation impinges on an inmate's constitutional rights, the regulation is nevertheless valid if it is reasonably related to legitimate penological interests. Shakur, 514 F.3d at 883–84 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). Under Turner, the court must balance four factors to determine whether a prison regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interests put forward to justify the regulation; (2) whether prisoners retain "alternative means of exercising the right" at issue; (3) the impact the requested accommodation will have upon inmates, prison staff and the allocation of prison resources generally; and (4) whether there are easy alternatives to the regulation which could be implemented at a minimal cost to legitimate penological interests. See Shaw v. Murphy, 532 U.S. 223, 229 (2001); Turner, 482 U.S. at 89–91. In evaluating a free exercise claim, courts must give "appropriate deference to prison

officials," O'Lone, 482 U.S. at 349, because "the judiciary is 'ill-equipped' to deal with the difficult and delicate problems of prison management." Thornburgh v. Abbot, 490 U.S. 401, 407–08 (1989) (citation omitted).

**2. RLUIPA Standard**

The RLUIPA, 42 U.S.C. §2000cc et seq., provides in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. §2000cc–1(a).

Thus, RLUIPA mandates a stricter standard of review for prison regulations that burden the free exercise of religion than the reasonableness standard articulated in Turner. Greene v. Solano County Jail, 513 F.3d 982, 986 (9th Cir.2008) (citations omitted).

To establish a RLUIPA violation, the plaintiff bears the initial burden of proving that the defendants' conduct imposed a "substantial burden" on his "religious exercise." Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir.2005). Once the plaintiff establishes a substantial burden on his religious exercise, defendants must prove that the burden both furthers a compelling governmental interest and is the least restrictive means of achieving that interest. Id. at 995. The Ninth Circuit has set out four factors for the RLUIPA analysis: (1) what "exercise of religion" is at issue; (2) what "burden," if any, is imposed on that exercise of religion; (3) if there is a burden, whether it is "substantial;" and (4) if there is a "substantial burden," whether it is justified by a compelling governmental interest and is the least restrictive means of furthering that compelling interest. Navajo Nation v. U.S. Forest Serv., 479 F.3d 1024, 1033 (9th Cir.2007), aff'd en banc, 535 F.3d 1058, 1068 (9th Cir.2008).

Although RLUIPA does not define what constitutes a "substantial burden" on religious exercise, the burden must be more than a mere inconvenience. Navajo Nation, 479 F.3d at 1033 (internal quotations and citations omitted). The Ninth Circuit has stated that a substantial

6

burden is one that is " 'oppressive' to a 'significantly great' extent." That is, a "substantial burden" on "religious exercise" must impose a significantly great restriction or onus upon such exercise. Warsoldier, 418 F.3d at 995 (quoting San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir.2004)). The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience." See Navajo Nation, 479 F.3d at 1033 (internal citations omitted). In addition, a substantial burden exists when the state, "denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." Shakur v. Schriro, 514 F.3d 878, 888 (9th Cir.2008) (quoting Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 717–18 (1981) (internal quotations omitted)).

### 3. Supervisor Liability Standard

In Iqbal, the U.S. Supreme Court specifically addressed supervisor liability in the context of Section 1983 actions. 556 U.S. 662, 675-678 (2009). The Supreme Court held that since "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates... a plaintiff must plead that each Government-official defendant, through the official's own actions, has violated the Constitution." Id. at 676. Given this, the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's" actions is sufficient to adequately allege Section 1983 liability against a supervisor in his individual capacity. Id. at 677.

### 4. Personal Participation Standard

Liability under Section 1983 arises only upon personal participation by the defendant. Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979). "A person deprives another of a constitutional right, within the meaning of Section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation which [the plaintiff complains]." Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988) (citation omitted). The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a

constitutional deprivation. Id.

### a. First Amendment Analysis

According to Defendants, in developing the five-inmate minimum chapel policy, Warden Neven and the Nevada Department of Corrections (hereinafter referred to as "NDOC") took into account staffing availability and the conservation of staff. Neven decided that it was an inefficient use of resources to send staff to escort, and attend to, less than five inmates to chapel services. Additionally, Defendants contend that any inmate that had established their religion with the chaplain was allowed to tell custody staff they wanted to attend services at the chapel.  If the number was less than five, but still a group, the inmates would be allowed to gather in visiting areas. See Neven Declaration (#272). Similarly, according to Defendants, logistical difficulties, security concerns exacerbated by the dark, and lack of adequate staffing trumped Plaintiff's request for Sabbath services, lasting two hours after sunset, twice a week.  Further, Defendants state that offering Plaintiff these privileges would be unfair to other inmates without post-sunset/evening privileges.

### i. Whether there is a Valid Rational Connection between the Prison Regulation and the Legitimate Governmental Interests Put Forward to Justify the Regulation

The "regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. at 89–90. Additionally, "the governmental objective must be a legitimate and neutral one." Id. at 90 (citation omitted). With respect to the connection between the regulation of religious exercise and the legitimate penological interest, evidence concerning anticipated problems, even though no actual problems have arisen from the prisoner's conduct, is sufficient to meet this standard. See Friedman v. Arizona, 912 F.2d 328, 332–33 (9th Cir.1990), cited by Stevens v. Skolnik, 2014 WL 2573392, at *5 (D. Nev. June 9, 2014), aff'd, 616 F. App'x 297 (9th Cir. 2015).

According to Defendants, it is essential that security concerns are taken into account when

considering whether to allow a religious group chapel or common room access to conduct evening worships. These concerns include sufficient staffing, intermingling of inmates at different classifications, and the implementation of adequate security. Defendants contend that HDSP Operating Procedure 800, the operative administrative policy, was neutral on the basis of religion. According to Defendants, if there were not enough inmate participants to justify assigning a custody staff member to oversee a gathering, it was not an efficient use of staff resources to assign a correctional officer to less than five inmates.  Efficient use of staffing resources serves as a legitimate penalogical interest and security concern.

### ii. Whether Alternative Means of Exercising Defendant's Rights Existed

Where "other avenues remain available for the exercise of the asserted right'... courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation." Turner, 482 U.S. at 90 (citation omitted).

According to Defendants, Plaintiff was provided many opportunities to practice his religion. For example, while in segregation, Rabbi volunteer Tzvi Brochtain visited with Plaintiff every time he came to HDSP. Defendants contend that Rabbi Brochtain brought books and pamphlets during each visit. Additionally, per his own Complaint narrative, Plaintiff was able to visit with a Rabbi Karnovsky from the Aleph Institute of Michigan.

As noted in Chaplain Calderin's declaration, Rabbi Brochtain did bring a Teffilin with him and held prayer for Plaintiff when he was in Administrative Segregation. Calderin supervised these visits.  Further, according to Defendants, since there were not enough participants in the Jewish chapel program, Calderin offered Plaintiff the opportunity to attend Muslim services after receiving instructions from Calderin on approximately five occasions.  Plaintiff accepted the invitation and attended the same.

Chaplain Calderin discussed chapel and various issues regarding Judaism with Plaintiff during the subject time of this complaint, according to Defendants. Further, Plaintiff, at all times

during the Complaint, was able to freely practice his religion independently in his cell, whether he was in segregation unit or general population. The Court notes that Plaintiff has not averred that he was unable to practice his religion, just that he was unable to attend any Jewish group chapel services due to the five-inmate HDSP policy.  Additionally, groups of less than five inmates are still permitted to hold religious group services in the visiting area of HDSP, according to Defendants.

### iii. The Impact the Requested Accommodation will have Upon Inmates, Prison Staff and the Allocation of Prison Resources Generally

Under the third Turner factor, a court may consider security concerns. See McCabe, 827 F.3d at 637.  Essentially, Plaintiff is requesting that he be provided chapel services, even if he was the only Jewish inmate requesting chapel services, at the time. According to Defendants, this is an inefficient use of staff resources for a prison that has over 3,500 inmates especially since every chapel service requires that the Chaplain and a correctional officer be present.

As discussed infra, according to Defendants, Warden Neven balanced the best ways to utilize prison staff with prisoners' rights to attend chapel services when implementing the operative HDSP policy. Accordingly, the Court finds the impact of Plaintiff's requested accommodation outweighed by the volume of inmates, availability of prison staff and the need to allocate prison resources efficiently.

### iv. Whether There Were Obvious, Easy Alternatives to the Five-Inmate Policy

Finally, with respect to the fourth Turner factor, prison officials do not bear the burden of disproving the availability of alternatives. See O'Lone, 482 U.S. at 350. Further, the absence of ready alternatives is evidence of the reasonableness of a prison regulation while the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns. Turner, 482 U.S. at 90.

In his Complaint, Plaintiff contends that NDOC could easily use activity rooms for smaller group religious gatherings. According to Defendants, the activity rooms are generally not used for any types of religious meetings or services, and would also require a correctional officer, thus incurring the same problem with staffing as noted in the "five-inmate policy." Further, as stated infra, groups of less than five inmates were permitted to hold group services, in visiting areas of HDSP. Further, Plaintiff fails to aver in his Complaint whether he attempted to congregate with smaller groups of Jewish inmates. Based on the facts and evidence herein, the Court finds no obvious, easy alternatives to HDSP's five-inmate policy.

### b. RLUIPA Analysis

A prison policy that pressures an inmate to abandon his religious beliefs imposes a substantial burden. Shakur, 514 F.3d at 889 (citing Warsoldier, 418 F.3d at 996). An inmate need not be prevented from participating in the exercise to be substantially burdened; conditioning a benefit on an inmate's abandonment of the religious conduct is sufficient. Warsoldier, 418 F.3d at 996. For instance, an inmate demonstrated a substantial burden where his refusal to comply with a regulation that conflicted with his religious belief resulted in confinement to his cell, additional duty hours, restricted privileges, and the reduced ability to purchase items from the prison store. Warsoldier, 418 F.3d at 996. Cited by Shilling v. Crawford, 536 F. Supp. 2d 1227, 1233 (D. Nev. 2008), aff'd, 377 F. App'x 702 (9th Cir. 2010).

According to Defendants, all inmates, including Plaintiff were free to engage in worship in their cells, regardless of classification. Further, Defendants contend that Plaintiff was permitted to practice with smaller groups of inmates in visitor areas. Plaintiff states in his Complaint that when he was classified as a Level 1 and Level 2 inmate, the only time he was permitted to socialize with other inmates was during gymnasium and "yard" time, however, Plaintiff fails to mention that he made attempts to locate other members of the Jewish faith for the purposes of forming a group with which to practice his religion. Therefore, while Plaintiff generally states that his rights have been violated under RLUIPA, he provides no evidence to demonstrate how his ability to exercise his

religion was substantially burdened by the HDSP policy. Accordingly, this Court finds no violation of RLUIPA attributable to Defendants.

Further, "maintain[ing] good order, security and discipline, consistent with consideration of costs and limited resources," is a compelling government interest. Cutter v. Wilkinson, 544 U.S. 709, 722 (2005). Additionally, avoiding prohibitive expenses qualifies as a compelling interest. Shakur, 514 F.3d at 889. It does not appear that the parties dispute that cost and security concerns are a compelling government interest.  As such, the Court finds that Defendants have provided ample reasons for enforcing the HDSP five-inmate policy.

For the reasons set forth above, the Court finds no genuine issues of material fact in Count 1 of the Complaint. Accordingly this Court **GRANTS** Defendants' Partial Motion for Summary Judgment of Count 1 (#269).

**C. Plaintiff's Count 2: First Amendment and RLUIPA**

Count 2 of Plaintiff's Complaint pertains to the very limited issue of whether the manner of provision of kosher meals at HDSP denied Plaintiff's First Amendment right to the free exercise of his religion.

According to Defendants, Plaintiff began receiving kosher meals at HDSP after sending a request to Defendant Associate Warden Cole Morrow on January 16, 2010.  According to Defendants, HDSP Culinary prepared and pre-heated kosher meals in a "blessed microwave" dedicated solely to kosher meals and search and escort delivered the meals to Plaintiff pursuant to instructions provided by rabbinical counsel. If an inmate required a meal to be re-heated, he would send it to the correctional officer to return to Culinary to use the kosher microwave.

Plaintiff was relocated to Level 2 housing in February 2010.  According to Defendants, all meals continued to be  delivered to him by search and escort.  Plaintiff alleges that the meals would arrive opened by culinary and that they were cold.  Specifically, Plaintiff alleges that by opening the meal packet for heating, that Culinary and/or correctional officers were defiling the meal. Plaintiff sent requests to Defendant Duane Wilson, the food services manager, asking Culinary to deliver his

meals unheated, and to allow him (Plaintiff) to use the general use microwave oven on his unit floor to heat and prepare his own food. Wilson responded that the general use microwaves were not kosher, and instructed Plaintiff not to use these microwaves.

Plaintiff further alleges that rabbis from the Michigan Aleph Institute told him that so long as food was double wrapped, it would remain kosher even if heated in a normal microwave. According to Plaintiff, three Defendants, correctional officers Camacho, Carbajal, and Christilli threatened Plaintiff with discipline for using the microwave oven in the housing unit.

Plaintiff alleged that on June 20, 2010, officer Christilli confiscated his meal because he used the microwave in his housing unit. Additionally, Plaintiff states that Defendant Duane Wilson threatened to sever Plaintiff from the kosher diet if he continued to use the general use microwave.

On June 27, 2010, Defendant Carbajal issued Plaintiff a Notice of Charges alleging "Adulteration of any food or drink" and "failure to follow posted rules and regulations." On July 20, 2010 Defendant Edward Provencal held an administrative hearing wherein he found Plaintiff guilty of these infractions. Plaintiff filed an appeal. Defendant Warden Anthony Scilia upheld the appeal and reversed the findings on November 8, 2010. Plaintiff claims that he was damaged because he lost privileges such as use of the microwave between the July hearing and the date of the appeal.

According to Defendants, HDSP Operation Procedure 809, which was effective in 2008, stated that an inmate may be removed from religious (kosher) diet for consuming food items prohibited by the religious diet. As such, according to Defendants, the correctional officers understood that permitting a practicing Jewish inmate to consume food cooked in a non-kosher microwave could have resulted in a violation of kosher diet rules.[1]

---

[1] Although not included in the Complaint, Defendants contend that it is imperative to note that Plaintiff was written up for an incident directly involving a kosher meal while housed in unit 10A3 at HDSP for unauthorized trading of kosher meal items and for impermissibly removing a kosher meal to his cell. The charge Plaintiff received was Trading, Bartering, Lending of items which included his kosher food items. Plaintiff was also charged with unauthorized trading and tampering with a locking device when he was observed giving his kosher meal to other inmates. Plaintiff received a loss of canteen privileges and disciplinary segregation for those offenses in October 18, 2010.

### 1. First Amendment Analysis

Defendants assert that they have a valid penological interest in the orderly administration of a program that allows NDOC to accomodate the religious dietary needs of thousands of prisoners. With respect to the first Turner factor, pursuant to the facts stated herein and legal authority provided by Defendants, the Court finds a valid rational connection between the prison regulation and the legitimate governmental interests set forth to justify the regulation. The NDOC policy of using a new or blessed microwave to heat Plaintiff's meal, pursuant to rabbinical counsel, did not serve as an impediment to Plaintiff's ability to practice his religion or defile himself. According to Defendants, this practice was developed in order to protect Jewish inmates and to ensure that their diets adhere to strict religious protocols. Further, with respect to the second Turner factor, Plaintiff had the option of having any cold food sent back to Culinary to be heated in the kosher microwave. Further, Plaintiff's allegations do not contradict Defendants' assertions.

Additionally, Plaintiff's argument rests on his dissatisfaction with not being able to use a "non-kosher" microwave to heat his kosher meals. With respect to the third Turner factor, Defendants argue that the impact of Plaintiff's request to use a non-kosher microwave would have an impact on inmates, prison staff and the allocation of prison resources generally.  According to Defendants, this request, in theory, would lower the burden on Culinary to prepare meals in accordance with certain kosher requirements as kosher meals are more expensive than regular meals, require more preparation, and require staff resources to deliver the meals to Plaintiff. However, according to Defendants, a prison must undertake all reasonable efforts to accommodate religious requirements. This includes providing and maintaining an orderly policy that respects inmate rights in the most efficient manner possible. Defendants contend that if other inmates believe that requiring Jewish inmates to use a normal microwave is not a kosher practice, then NDOC, essentially, would be asking these Jewish inmates to defile their personal practice. Finally, with respect to the fourth Turner factor, the alternative Plaintiff is requesting – use of non-kosher microwaves – raises security and penological concerns as stated above.  Plaintiff has failed to allege

facts which contradict Defendants assertions, nor has Plaintiff provided evidentiary support for the same.  Accordingly, the Court finds a valid penological interest exists for the NDOC kosher meal policy.  As a result, the Court finds no genuine issues of material fact with respect to Plaintiff's First Amendment claim in Count 2 of the Complaint.

### 2. RLUIPA Analysis

Plaintiff provides no evidence or allegations demonstrating how his ability to exercise his religion is burdened by having his meals prepared in a kosher-designated microwave, in accordance with policies developed with rabbinical counsel.  The Court finds no evidence that the NDOC policy of heating kosher food in a new or kosher-designated microwave pressures Plaintiff to abandon his religious beliefs. On the contrary, it ensures that his meals are prepared in accordance with the Jewish religion kosher diet tenets. While Plaintiff may be inconvenienced by sending food back for reheating, this does not amount to a substantial burden on Plaintiff, nor does it curtail his religious practice. Accordingly, this Court finds no genuine issues of material fact with respect to Plaintiff's RLUIPA claims in Count 2 of the Complaint.

For the reasons set forth above, the Court finds no genuine issues of material fact in Count 2 of the Complaint. Accordingly this Court **GRANTS** Defendants' Partial  Motion for Summary Judgment of Count 2 (#270).

### D. Plaintiff's Count 3: Eighth Amendment

Count 3 of the Complaint consists of the single claim that Plaintiff was allegedly placed in a cold, mostly bare cell for seven days and six nights that was infested with ants that crawled all over him.

The Eighth Amendment requires prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994).  But the "Constitution does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. 337, 349 (1981). "To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and

a subjective standard—deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled on other grounds by Peralta v. Dillard, 744 F.3d 1076, 1083 (9th Cir. 2014); see also Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir.2000) ( "the routine discomfort inherent in the prison setting is inadequate to satisfy the objective prong of the Eighth Amendment inquiry"); see also Farmer, 511 U.S. at 837 (a prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

The Eighth Amendment "guarantees adequate heating" but not necessarily a "comfortable temperature." Graves v. Arpaio, 623 F.3d 1043, 1049 (9th Cir. 2010) (quoting Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996)). One measure of an inadequate, as opposed to merely uncomfortable, temperature is that it poses "a substantial risk of serious harm." Id. (quoting Farmer, 511 U.S. at 834). Conditions of confinement may combine to violate the Eighth Amendment if "they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." Wilson v. Seiter, 501 U.S. 294, 304 (1991). Freezing temperatures in a cell that pose a substantial risk of serious harm can rise to the level of an Eighth Amendment violation. See Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir.1980).

**1. Objective Standard**

The Court finds that Plaintiff has failed to establish that the Defendants inflicted cruel and unusual punishment on him. Specifically, Plaintiff contends that from November 12, 2010 to November 18, 2010, Defendants placed him in a cold cell in an Administrative building meant for holding, or otherwise temporary placement of inmates, without a bed, windows, or insulation. Further, Plaintiff contends that the cell within which he was housed during this week was infested with ants that were crawling all over him. In this regard, Plaintiff maintains that Defendants denied

him a basic human need (warmth and lack of insect infestation) in violation of the Eighth Amendment.

Both parties contend that Plaintiff was provided a mattress, sheets, a blanket, and shower shoes during his stay in the Administrative building. Further, Defendants offer evidence to support the assertion that the Administrative building was regularly sprayed by an exterminator, and further that the administration was not made aware of an ant infestation. Plaintiff did not present any evidence of a bug bite, infection, injury or malady to HDSP's Medical staff regarding the ants, despite the fact that Plaintiff was able to communicate directly with correctional officers via the push of a button, as stated in his Complaint. Thus, the allegations presented by Plaintiff in his Complaint fail to establish that Defendants inflicted cruel and unusual punishment upon Plaintiff.

**2. Subjective Standard**

Even if Plaintiff could satisfy the objective prong with respect to this Eighth Amendment claim by raising a genuine issue of material fact in opposition to Defendants' Partial Motion for Summary Judgment (#271), which he has not done, he has not presented any evidence showing that Defendants had a subjective intent or desire to keep Plaintiff in a cold cell. It is well established that cruel and unusual punishment claims require the court to inquire into a prison official's state of mind. See Wilson, 501 U.S. at 299. Here, the Court finds no evidence presented in connection with the pending summary judgment motions that supports Plaintiff's claim that Defendants intentionally denied him adequate warmth in reckless disregard to a substantial risk of serious harm to Plaintiff. Farmer, 511 U.S. at 835. Nor does this Court find evidence to support an ant infested cell to rise to the level of presenting a substantial risk of serious harm to Plaintiff. The allegations in the Complaint are not enough to establish that Defendants acted with the requisite culpable state of mind. See Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1081 (9th Cir.1996) ("The mere existence of a scintilla of evidence is not enough to create a genuine issue of material fact in order to preclude summary judgment.").

1   For the reasons set forth above, the Court finds no genuine issues of material fact in Count 3
2 of the Complaint. Accordingly this Court **GRANTS** Defendants' Partial Motion for Summary
3 Judgment of Count 3 (#271).

4   **E. Qualified Immunity**

5   Defendants contend that they are entitled to qualified immunity. Government officials enjoy
6 qualified immunity from civil damages unless their conduct violates "clearly established statutory or
7 constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457
8 U.S. 800, 818 (1982). In ruling upon the issue of qualified immunity, one inquiry is whether, taken
9 in the light most favorable to the party asserting the injury, the facts alleged show the defendant's
10 conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001).

11   The other inquiry is whether the right was clearly established. Saucier, 533 U.S. at 201. The
12 inquiry "must be undertaken in light of the specific context of the case, not as a broad general
13 proposition ...." Id. "[T]he right the official is alleged to have violated must have been 'clearly
14 established' in a more particularized, and hence more relevant, sense: The contours of the right must
15 be sufficiently clear that a reasonable official would understand that what he is doing violates that
16 right." Id. at 202 (citation omitted). In resolving these issues, the court must view the evidence in the
17 light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.
18 Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir.2003). Qualified immunity protects "all but the
19 plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341
20 (1986).

21   Based upon the Court's findings, Defendants will be granted judgment as a matter of law,
22 and thus the Court need not discuss the issue of qualified immunity.
23 ///

## IV. Conclusion

For the reasons stated herein, the Court finds that Plaintiff has failed to provide support for a finding of any genuine issues of material fact as to Defendants' assertions within their Partial Motions for Summary Judgment. Further, Plaintiff has failed to respond to the motions at all. Therefore, this Court **GRANTS** Defendants' Partial Motions for Summary Judgment (##269, 270, 271).

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Partial Motions for Summary Judgment (##269, 270, 271) are **GRANTED**.

DATED this __29th__ day of March 2017.

_____
Kent J. Dawson
United States District Judge